Exhibit "A"

Case 1:23-cv-11217-JGLC   Document 1-1   Filed 12/27/23   Page 2 of 44

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| JOBAR HOLDING CORPORATION, ROBERT BUCK, Individually, and ROBERT BUCK, As Executor of the Estate of JOAN BUCK, and ROBERT BUCK, individually and ROBERT BUCK, As Executor of the Estate of JOAN BUCK, derivatively as shareholders on behalf of JOBAR HOLDING CORPORATION, | Index No.: |
| Plaintiffs, | **COMPLAINT** |
| - against – | **ECF CASE** |
| DAVID HALIO, | |
| Defendant. | |

Plaintiffs, JOBAR HOLDING CORPORATION, ROBERT BUCK, individually, and ROBERT BUCK, As Executor of the Estate of JOAN BUCK (hereinafter, collectively "Buck"), and ROBERT BUCK, individually, and ROBERT BUCK, As Executor of the Estate of JOAN BUCK, derivatively as shareholders on behalf of JOBAR HOLDING CORPORATION ("Jobar"), by Scarinci & Hollenbeck, LLC their attorneys, complaining of the Defendant, Dr. David Halio, respectfully allege as follows:

1

## PRELIMINARY STATEMENT

1.      Defendant used trickery and deceit in a banking and tax fraud scheme developed and implemented in concert with his mother, Barbara Halio ("Barbara"), to loot the bank account of an inactive family corporation of its more than $1,500,000 in cash that was supposedly held in a fiduciary capacity for the benefit of all eleven family shareholders.  Defendant has received $500,000 or more in fraudulent transactions effected by and with Barbara, ongoing and designed to illegally obtain and retain funds for herself and her children at plaintiffs' expense. The scheme played out for over a decade, hidden by false and misleading tax filings and Dr. David Halio's role only came to light during a litigation brought against Barbara in which she submitted sworn statements which show her theft, the diversion of Jobar money from the account amount owed to Buck, and David's testimony of receipt and non-repayment of hundreds of thousands of dollars of so-called "loans" and other payments made by Barbara from that account for defendant's benefit and to hinder payment to Buck of the more than $570,000 Jobar owed to Buck out of the principal and earned interest of the $1,500,000 held back in that account after the liquidation of the building. The sold building was the sole operating asset of Jobar in 2006. Several of the shareholders who are not Barbara's children, demanded and received payment owed on their proportionate shares.  Barbara's children, other than David, Dr. Michon Halio ("Michon") and Esther Halio Peyron ("Esther"), claim they waived such payment in favor of Barbara's receipt thereof.  However, even after Barbara had taken her and their distributive shares, Barbara distributed more than their percentage shares in Jobar to them, and made further fraudulent transfers to them in 2020, as well as fraudulent transfers to her grandchildren, Esther's children, Oliver Peyron ("Oliver") and Stefan Peyron ("Stefan"), and yet another so-called "loan" to Barbara's son-in-law, Esther's husband, Nils Peyron ("Nils"). The fraudulent conveyances to the

4886-3663-6818, v. 1

INDEX NO. 161397/2023

RECEIVED NYSCEF: 11/20/2023

Case 1:23-cv-11217-JGLC    Document 1-1    Filed 12/27/23    Page 4 of 44

defendant from his mother continued after 2020, in different forms, while Barbara claimed to be living on her monthly social security payments. These "loans," gifts, and other fraudulent conveyances were made to hinder and deprive Buck of receipt of the payments owed to Buck. Barbara specifically promised, under oath, to repay "Robert." Instead, Barbara continued to make fraudulent conveyances of her funds to her above-described family members. Buck received nothing of the $1,500,000 of Jobar funds held back in a Jobar account. Buck waived nothing. Plaintiffs herein seek to trace where the funds went after they were looted from the Jobar corporate account and to recover what is owed. Buck seeks to recover the legal fees and costs incurred in seeking to recover funds owed - even Barbara admits that Buck is owed hundreds of thousands of dollars that she promised to pay Buck years ago. Defendant admits he received hundreds of thousands of dollars in excess of his fair share directed to him or for his benefit out of the $1,500,000 account.  In his January 19, 2023 sworn testimony, defendant bizarrely claimed he did not ask his mother to send any of the fraudulent conveyances to him.

2.      The scheme was simple, and if no one looked into it, it would have worked. Over the years after Jobar had sold its building, the defendant and Barbara titled dozens of transfers to themselves out of the Jobar holdback account action as a so-called "loan." However, there was no loan document, no provision or payment of interest, and no repayments by defendant or Barbara of any of the principal or interest for any "loan" transfers made to them out of the Jobar account.

3.      Thus, defendant and Barbara enriched themselves by invading the corporate account, transferred, benefitted from, took and kept a total in excess of $1,500,000 out of Jobar's account in what they called "loans" and also in other downstream transactions, all in dozens of check and wire transfers for their personal benefits, and for the personal benefits of their

immediate family, to the detriment of plaintiffs. None of the "loans" or other fraudulent transfers were repaid by defendant, by his siblings, by Nils or his children, Oliver and Stefan, or by Barbara.  Not one penny of interest was charged to them or paid by them on the "loans."  No paperwork documented the "loans" taken from Jobar, and, to the extent that transactions with Jobar or Barbara are documented, the documentation confirms that they were fraudulent transactions, absent of fair consideration. For example, in 2013 alone, Barbara transferred a total of approximately $200,000 to David or a creditor of David, in transactions including: a $20,000 check dated March 2, 2013, as a purported loan to David; a $10,000 check dated April 12, 2013, to David as a purported loan to David; an April 15, 2013  wire transfer in the amount of $43,996 to pay the overdue premium for David's professional malpractice insurance policy after his check to the insurer had bounced; a May 3, 2013 wire transfer to David's bank account in the amount of $50,000, which is a wire transfer that David claims he never asked for, but admits he has not returned the money; a November 22, 2013 wire transfer to David's bank account; and, a December 20, 2013 $60,000 wire transfer, which like the others went from Jobar's Holding account to David's personal account.  David acknowledged at his January 19, 2023 deposition that he never paid back any principal or interest to Jobar for any of the Jobar wire transfers or any checks marked "Loan."

4.      Defendant contends he never asked for any of the "loans," never requested that Barbara send him the "loans" or other transfers and payments to or for defendant that were sent by Barbara, including in 2020, and other fraudulent transactions related to payments in support of defendant's medical practice, prior to and after 2020, all of which total approximately $500,000 or more. Defendant denies requesting his mother to send any of these fraudulent transfers; this, even though funds were sent to him or were paid for his benefit or deposited to his

Case 1:23-cv-11217-JGLC    Document 1-1    Filed 12/27/23    Page 6 of 44

bank account for years. In any event, he kept the money. For these fraudulent transactions, plaintiffs demand that defendant account and repay the plaintiffs.

5.      Buck has expended more than $500,000 in investigative and legal fees and costs to learn of the existence, nature and extent of the fraud and fraudulent transfers committed by Barbara, acting in concert with defendant, and other members of her immediate family.  Recent case law supports recovery of legal fees from defendant that were, and are being, incurred in protecting the Buck interest in the estate assets and in discovering and prosecuting for the return of the fraudulently converted Jobar funds.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to C.P.L.R. §301 because Dr. David Halio resides and conducts business in the County and State of New York.  Alternatively, this Court has jurisdiction pursuant to C. P. L. R. § 302 because David regularly transacts business in New York.

7.      Venue is proper in this Court under C. P. L. R. § 503(b) because Plaintiff, Robert Buck, as Executor of the Estate of Joan Buck, was and is an executor appointed in the County of New York, defendant resides in the County of New York and maintains offices in New York and Nassau Counties.

## STATEMENT OF FACTS

8.      Defendant, Dr. David Halio ("David"), is the son of Barbara Halio.  Barbara Halio is the sister of the deceased Joan Buck ("Joan") and the aunt of plaintiff Robert Buck ("Robert") the son and executor of Joan's Estate.  Joan and Barbara were listed as co-executrices in the will of their mother, Kitty Buck, but Joan Buck died in 2005. Barbara admits that while thereafter serving as President of the inactive family-owned Sub-Chapter S corporation, Jobar

5

Case 1:23-cv-11217-JGLC    Document 1-1    Filed 12/27/23    Page 7 of 44

Holding Corporation ("Jobar"), she "borrowed" and personally spent more than $1,000,000 from a Jobar account, and paid additional amounts to her children and their families, after the business had been essentially wound down when it sold its business in 2006, and, in 2020, after she sold a vacation home that she had supported with funds she looted from Jobar.  Barbara was the chief executive and operating officer, and a director of Jobar, since at least 2005, and at all relevant times, the signatory on all Jobar bank accounts.

9.      Barbara admits that she took unpaid "loans" of more than $1,000,000 from a Jobar account that had been established with $1,500,000 from the sale of Jobar's only business – the building at 120 West 72nd Street in Manhattan. The building, purchased 50 years earlier, was sold in 2006 for $22 million, with net proceeds of $20,500,106. After the 2006 sale, the company had no remaining operating business. In May 2006, approximately $18,000,000 of the proceeds was distributed to the Jobar shareholders proportionate to their ownership interests in Jobar.  The company had no other business. After paying the mortgage on the building, fees, bills and taxes, in 2006 the remaining sum of $1,500,000 was set aside in a bank's money market account, to earn interest and to be further distributed proportionately to the Jobar shareholders upon establishing that no further claims, disputes or obligations existed as to the remaining $1,500,000 proceeds of the sale of the building (the "Holdback").  Jobar had no other material assets or operations after the 2006 sale.

10.      Within a relatively short time after the 2006 closing of the sale of the Jobar building, it became apparent to Barbara that there remained no reason to avoid distributing remaining funds from the Holdback.  So, without telling Robert Buck, and with the knowledge and consent of her "kids," David, Esther and Michon, Barbara admits she distributed more than $1,000,000 of the Holdback funds and derivatives therefrom, to and for the benefit of herself, as

4886-3663-6818, v. 1

so-called "loans" over a period of years.  Barbara also distributed a six figure amount out of the Holdback funds to her son, David, the defendant herein, including describing them as loans. Defendant admits he never repaid these loans. Defendant also admits he never paid any interest on the so-called "loans." Barabara made payments amounting to substantially more than five hundred thousand dollars paid out of the Holdback and derivative funds therefrom to the members of Barbara's family, David, Michon, Esther, Nils, Oliver and Stefan, to the exclusion of Buck. But that information was withheld from Buck. Barbara and her family members kept that information from Robert, including through a devious and untrue listing of funds taken by Barbara and David as "loans" which they never repaid.  Barbara was managing the Holdback funds as fiduciary to Jobar and for the benefit of all the Jobar shareholders, all of whom are relatives.  Barbara did not distribute anything owed to the Estate of Joan Buck or to Robert. Instead, Barbara steadily transferred to herself and for her benefit, to her creditors, and to and for her son, David, including to David's creditor, among others, the entirety of the Holdback, including substantial interest earned and owed thereon, as well as funds derived from assets supported by the Holdback.  Now, Barbara admits she "took the money" (her words).  She also claims the money is "gone."  Barbara claims she now has no income, and that she is living on social security.  She claims she is unable to repay the purloined money she misappropriated from the Holdback that she was entrusted to manage, as a fiduciary, thus, breaching her duties owed to the plaintiffs. The Estate of Joan Buck and Robert Buck have never received a single dollar of their 30% and 8% shares of the Holdback funds. By contrast, Barbara's family members, particularly defendant David, have benefited and continue to benefit from Barbara's transfers and payments, continuing even to today for the benefit of David.

11.     Barbara is separately being sued by the instant plaintiffs in an action presently pending in the New York County Supreme Court, under index number 655689/2017 (the "Buck v. Barabara Halio Case"). A basis of that lawsuit is that Barbara, instead of distributing the Holdback funds to all shareholders proportionate to their equity ownership in Jobar, as she had promised, with 30% to be paid to the Estate of Joan Buck and 8% to Robert Buck, Barbara distributed payment to all the other shareholders and none to Buck. All of the other shareholders of Jobar are, like Joan was and Robert is, descendants of Kitty Buck, the mother of Barbara and Joan, who died at age 93 in 2001. In her will, Kitty Buck divided her Estate equally between Joan and Barbara. But, as further described herein, as happened with the Jobar Holdback, Barbara, with the aid and abetting of her children, withheld and misappropriated assets and information regarding assets of the Estate of Kitty Buck. The continuing cooperative misdirection, deception and withholding of assets and information entrusted to her, is a pattern. David aided and abetted Barbara's frauds. He did so, in substantial part by conspiring with Barbara to denude her and Jobar of assets and enrich himself at the cost of the plaintiffs as further described below.

12.     Even now, David continues to withhold from plaintiffs, not just the Holdback funds he admits he received as purported loans, but he also receives Barbara's continued payments to his benefit out of funds derived through Jobar's prior payments that Barbara had specifically promised, under oath, she would pay to Buck when her Watermill, New York vacation home was sold in 2020. Instead, Barbara transferred funds derived from the sale of the Watermill property to the benefit of Barbara's children and grandchildren, and her son-in-law, in fraudulent conveyances, including an April 25, 2020 $30,000 check she wrote on her own account paid to David; this was from proceeds of the sale of her vacation home. Barbara now

claims she lacks funds to repay these plaintiffs for the moneys purloined from Jobar and Buck. The principal fraudulent device Barbara and her children, including David, used for denuding Barbara of assets with which to repay the plaintiffs was to entitle transactions as "loans," which were actually Barbara looting Jobar, and also making gifts to her children, her son-in-law and her grandchildren; withholding funds from Buck. So-called "loans" to David were never repaid, and there was never a plan to repay such loans. David has admitted receiving these payments. David has admitted the checks were entitled "Loan."  David has admitted that he has never repaid anything on any of the so-called "loans" made to him.  These were never loans; there were no promissory notes and no stated due dates or interest provided or paid.  David has not stated there was any consideration for the moneys received by him through Barbara's fraudulent acts, nor for the moneys advanced by or through Jobar, directly or indirectly, for the benefit of his medical offices over the years, and continuing to the present.

13.    Plaintiffs claim that Barbara Halio's improper withdrawals, as a faithless servant, are fraudulent "loans" and improper payments to third parties. One example is a professional liability policy premium payment of more than $43,000 wired out of the Holdback for the benefit of David's medical practice.  David cannot deny that he owes repayment of the unrepaid "loans." David does not deny that he has received the benefit of payments alleged herein. It is beyond dispute that the Estate of Joan Buck and Robert Buck have not received a nickel of the unpaid 38% of the Holdback, plus years of unpaid interest on the withheld funds. Whereas David has received and benefitted from payments from and derived through Jobar that total at least $500,000 or more that he admits he has not repaid.

Case 1:23-cv-11217-JGLC   Document 1-1   Filed 12/27/23   Page 11 of 44

14.     The scheme includes mail, wire and tax fraud, as further described herein, and was accomplished with the material assistance and knowledge of Barbara's family members, including David.

15.     As more fully described below, the defendant knew of Barbara's ongoing fraudulent activities, engaged in conduct that substantially assisted Barbara with her scheme, and personally benefitted from transactions that proximately caused financial injury to the plaintiffs.

16.     At all relevant times heretofore mentioned, Jobar was and is a domestic organization, organized on March 27, 1958 in the State of New York, and presently has its offices at 257 Foxhurst Road, Oceanside, New York 11572, in the County of Nassau.  That is Barbara's home.  That same building has, for decades, housed an office for David's medical practice.  David's medical practice has occupied a portion of that building, utilizing a separate entrance in Barbara's home. David has not paid any rent or costs of occupancy, instead relying on his mother's payments for the mortgage, maintenance and upkeep of the building and staffing required, through her direct and indirect payments thereof, for David's benefit and without consideration from David. All such payments related to this medical office constitute fraudulent conveyances received by David without consideration, and with David's knowledge that plaintiffs have not been repaid and were to have been repaid from the funds he instead received. Plaintiffs should have received funds through David's repayment of his "loans" from Jobar.

17.     At all relevant times heretofore mentioned, Plaintiff, Robert Buck, as Executor of the Estate of Joan Buck, was an executor appointed in the County of New York.

18.     At all relevant times heretofore mentioned, defendant David Halio was and is a New York County resident who maintains offices in Manhattan and Long Island.

4886-3663-6818, v. 1

19.     At all relevant times heretofore mentioned, David has received, and continues to receive fraudulent conveyances of funds through and from Barbara to the detriment of plaintiffs, as set forth herein, causing harm to plaintiffs as a result.

20.     By virtue of Barbara's acceptance of her respective offices in Jobar, Barbara was a fiduciary towards Jobar and all of Jobar's stockholders, including plaintiffs, Robert Buck, as Executor of the Estate of Joan Buck and Robert Buck.  Barbara owed them, and Jobar, a duty of faithfully, loyally, diligently, prudently, honestly and carefully conducting the business of Jobar and conserving Jobar's assets. Barbara, as such a fiduciary, was bound to act toward and deal with plaintiffs and Jobar's stockholders with the utmost fidelity, loyalty, care and good faith.

21.     Cake Masters ceased bakery operations in or about 1990 but, until 2006, Jobar stayed an active corporation as it continued to own and lease out the commercial property located at 120 West 72nd Street, New York, New York.

22.     Jobar sold the Property on May 12, 2006 for a sale price of $22,000,000.00, and net proceeds to its shareholders of $20,500,106.

23.     At the time of the sale of the Property, plaintiffs, Robert Buck, as Executor of the Estate of Joan Buck and Robert Buck, owned collectively as stockholders of record thirty-eight (38) shares of common stock of Jobar, representing a thirty-eight (38%) percent ownership interest in Jobar.

24.     Barbara has admitted that, upon the 2006 sale of the Property, Jobar "was solely concerned with winding up its affairs." David, a 12.5% shareholder in Jobar, was well aware that Jobar was no longer conducting any active business after the sale of the building in 2006 and that the multiple "loans" Barbara and David took from Jobar far exceeded the amounts their percentage shares of Jobar would have entitled them to receive.

11

Case 1:23-cv-11217-JGLC   Document 1-1   Filed 12/27/23   Page 13 of 44

25.     Upon information and belief, Barbara was the only authorized signatory on the Jobar banking accounts.

26.     During the period 2006 to present, Barbara, with the assistance of her children, perpetrated a systematic scheme to defraud Buck, and failed in her fiduciary duties to distribute assets and funds which were legally required to be delivered and/or paid to Buck.  Instead, Barbara breached her fiduciary duties owed to Buck.  One blatant example is that she did not honor her word given, in a sworn affidavit, to "pay Robert" out of value obtained from the sale of her vacation home, and instead misappropriated and converted funds and assets for the benefit of Barbara, her children, son-in-law and grandchildren, to the detriment of plaintiffs, without the knowledge, consent and/or authorization of Buck.

27.     Upon the sale of Jobar's 72nd Street building, substantial distributions to Jobar shareholders were made after the 2006 closing, and there remained a $1,500,000 "hold back" of remaining sale proceeds maintained in an interest bearing Jobar money market account at JPMorgan Chase Bank.  As part of her fiduciary duties as President and a Director of Jobar, Barbara was responsible for the protection, proper handling and the distribution of the Holdback that remained after winding down the Jobar operations.  The distribution of the Holdback was to be done proportioned to the percentage each of the Jobar shareholders owned in the company. Without the knowledge, permission, consent and/or authorization of Buck, but with the aid and assistance of her children, Barbara distributed the holdback disproportionately to her immediate family members, while she misappropriated, misused, converted and/or embezzled the rest of the $1,500,000 holdback of Jobar funds, and moneys derived therefrom, resulting in direct financial harm to Jobar, and the loss to Buck of 38% of the $1,500,000 Holdback, and additional losses.

12

28.     After transferring moneys from Jobar to herself and/or to her children or others under her control and direction, Barbara used the funds directly for personal expenditures, transferred the funds to personal bank accounts and/or used the funds for other purchases, such as real estate and home renovations, improvements and costs of ownership, travel, luxury cars, art and other purchases and payments for herself and her immediate family, including her son David's medical malpractice insurance premium, among other things.

29.     Plaintiffs, Robert Buck, as Executor of the Estate of Joan Buck and Robert Buck, individually, commenced a mandamus proceeding in 2016, pursuant to the shareholder's rights of inspection, including but not limited to those rights under applicable common law and New York State Business Corporation Law §624, requiring Jobar Holding Corporation and Barbara Halio, its president, and its other officers, peremptorily to submit all books, records, papers and contracts, including minute books and stock transfer books, and income tax records kept or entered into in its business, to inspection and examination (See, *In the Matter of the Application of Robert Buck and Robert Buck as Executor of the Estate of Joan Buck v. Jobar Holding Corporation, by Barbara Halio, its President to permit inspection of its books and records*, Nassau County, Supreme Court, Index No. 605680/2016.)

30.     In conjunction with the aforementioned mandamus proceeding, Buck was able to secure only a portion of the bank and financial records of Jobar.

31.     The bank and financial records that were secured through those proceedings, although incomplete, reveal that Barbara fraudulently transferred most of the Holdback from Jobar to herself, her family members, including defendant David, or controlled persons, entities and accounts to whom it was fraudulent to transfer the funds.

32.     Barbara did not act alone in carrying out her scheme. To help her orchestrate her scheme, and to keep Buck in the dark, Barbara had the material assistance of the actions of her children, including defendant David.

## DAVID HALIO AIDED AND ABETTED BARBARA'S FRAUD IN ACCEPTING AND KEEPING FRAUDULENT CONVEYANCES

33.     From at least 2007 to date, David provided assistance to Barbara in her scheme to defraud plaintiffs, and David has, to the present, been receiving, keeping and making false statements as to the fraudulent conveyances he received through Barbara's transfers to him of plaintiffs' funds.  This aided her scheme, which has continued to the present.

34.     David had and has actual knowledge that Barbara was systematically taking money out of Jobar's Holdback account in fraudulent transactions, using it for personal purposes not related to Jobar.  David was aware of checks paid to him, which he knew were falsely called "loans," yet were not treated as loans, and apparently were not intended by Barbara or David to be actually repaid. They were not repaid.  Similarly, transfers made out of the Holdback to non-Jobar accounts without any reasonable explanation were fraudulent conveyances.  For example, David has admitted that he did not repay Jobar's $43,996 payment of his professional malpractice insurance premium that Barbara sent to his insurer from the Holdback.

35.     Having participated repeatedly in the looting of the Holdback account, and being himself a substantial recipient of looted funds, David undoubtedly knew that moneys were being looted from the Holdback.

36.     David was also fully aware that he was not paying interest on any supposed loans, and that no provisions or demands for interest or repayment were ever made by Barbara on behalf of Jobar as its fiduciary.   David facilitated Barbara's looting of the Holdback, and the withholding and diverting of funds owed to plaintiffs, as described above.   He did so by

14

receiving proceeds thereof and in facilitating the dissemination of false and misleading information through the mails and by wire, including false and misleading documents and tax filings through and including to the present.

37.     From at least 2008 through the present, David filed false and misleading tax documents with the Internal Revenue Service and local tax authorities, in, among other things, failing to report as income monies David received out of the Holdback that exceeded his 12.5% ownership rights, and other payments forwarded to him by Barbara, such as the payment of his professional insurance policy premium.  These documents facilitated not only Barbara's looting of Jobar, but also apparently resulted in defendant's non-payment of income taxes on the undocumented and unrepaid Jobar "loans" and the hundreds of thousands of dollars of transfers and apparently improper payment of David's expenses by Barbara, including those made directly from or derived from the Holdback.  When deposed, David could not provide an explanation for the "loans," the payment of his professional insurance by Jobar, and other transfers or payments for his benefit by Barbara, while admitting that he knew about the "loans" and went along with what Barbara did over the years in denuding the Holdback and herself of assets.

38.     David has, thus, admitted that tax documents prepared and filed electronically by him, and on his behalf, and through the mails, materially failed to properly report his income. In his recent sworn statements, David admitted that he knew of and received the "loans" from Jobar, and that he never repaid a nickel of principal or interest on the "loans" and the other payments out of, or derived from, the Holdback orchestrated by Barbara.  David participated in Barbara's scheme and he is a direct beneficiary thereof.

39.     Upon information and belief, Turman & Eimer LLP ("Turman") prepared both Barbara's and David's personal and professional tax returns throughout the period of the

Holdback and thereafter until the institution of a lawsuit against Turman and Barbara by these plaintiffs in 2017.

40.     Upon information and belief, in filing his personal income tax returns throughout the period after the "loans" from Jobar were received by him by wires and checks sent to him by Barbara, David did not report as income any of the "loans" or other improper distributions of Holdback funds and funds derived therefrom.   In failing to report the "loans" and other distributions and payments for his benefit as income on his income tax returns, David facilitated and enabled Barbara's scheme to loot Jobar and not pay, or fraudulently defer, personal income taxes on their true incomes during the period. David knew or should have known that Barbara was purloining funds from Jobar in the years after 2006 to the present, including in the form of the fake "loans," since, among other fraudulent acts, a number of these "loans" were directly endorsed and deposited by David into his own bank account.

41.     Moreover, David knew that Jobar was, directly and indirectly, paying certain of his expenses, including for his medical practice, and for him.  But the tax filings and the K-1 's filed by David for the years after 2008, and until the present, did not reflect this.  Thus, David masked the "loans," and enabled Barbara to mask the existence of the fake "loans" and other improper transfers of Holdback funds, by his acts, including, but not limited to, the false and misleading tax documents prepared and disseminated after 2008 through the present.

42.     David knew Jobar was supposed to be "winding up its affairs" in 2006.  Yet, in serving as a recipient and beneficiary of numerous fraudulent transfers made by Barbara to him or for his benefit over the ensuing years, even continuing to the present, David knew that what he was reporting in his personal income tax returns was false.  The "winding up" of Jobar's affairs dragged on for over a decade serving no good purpose except to mask their deceptions, their

looting and their withholding of funds owed to plaintiffs.  After the 2006 sale of its Property, there was no good reason the winding up of this inactive company with no assets or operations other than bank accounts with significant funds available for distribution to shareholders took this long.  Jobar still exists, albeit without any assets or operations since 2017. The only reason Jobar was not dissolved was to aid and abet Barbara's hiding what she admitted, in her affidavit filed as Docket Number 169, at paragraph 15 in the Buck v. Barbara Halio Case: "I used the loans taken by me to pay for my daily living expenses…."

43.     David knew of Barbara's looting of the Holdback funds as it was happening. According to Barbara's sworn statement in Docket Number 169 above, at paragraph 14: "I withdrew much of the remaining Holdback in loans, starting with my family's share and with their approval."  David was a recipient of hundreds of thousands of dollars of the fake "loans" and of other distributions made to him or for his benefit out of the looted funds. David's false income tax filings sent electronically and in the mails, hiding his true income, affirmatively helped Barbara to continue her looting and to conceal her wrongdoing from Buck and from the taxing authorities.  David's active personal and professional involvement, including payment of costs of his medical practice continuing to this day, assisted Barbara not only in the looting, but also in her subsequent continuing efforts to denude herself of her assets so as to frustrate her creditors, particularly these plaintiffs, to whom she admits she owes a seven figure amount.

44.     Barbara now claims to have no material income or assets other than her Oceanside, New York home and funds deposited in a law firm's escrow account, both her home and the escrow account being held under court order for the benefit of the plaintiffs to secure any judgment they may obtain against her.

4886-3663-6818, v. 1

45.    David has maintained his medical offices on a cost-free basis in the Oceanside home for the years relevant to the instant claims.

46.    David admitted receipt of the hundreds of thousands of dollars of Jobar checks marked "Loan," and he admitted that he has not repaid any principal or interest on any of the checks marked "Loan" that he received from the Holdback. David admitted the receipt of other amounts that constitute fraudulent conveyances from the Holdback and from Barbara, and the free rent for his medical practice.  This constitutes wrongful conduct by defendant, in concert with, and in aid of Barbara's scheme to loot Jobar and to withhold payment she admits is owed to Buck; wrongful conduct continuing to this day.

47.    David's admission that he has never paid back any principal or interest on the "loans" nor on any of the fraudulent conveyances described herein, all support plaintiffs' claims against David of unjust enrichment.

48.    David acknowledged there are no documents or evidence of the "loans," other than that the checks he received for Jobar state the word "Loan" and there appear to be no documents supporting Barbara's wire and other transmissions and payments of funds to David, to his creditor or to pay costs and expenses from which David derived direct benefit, including payments made to this day.

## FIRST CAUSE OF ACTION

### (Unjust Enrichment)

49.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 48 above with the same force and effect as though fully set forth at length herein.

50.    Barbara and David have admitted facts showing that, from 2008 to the present, Barbara perpetrated a systematic scheme to defraud plaintiffs, which included fraudulent "loans"

and other transfers of funds to or for the benefit of the defendant. David admitted that he received and retained the "loans," that he has not repaid a penny of principal or interest, and that he received other payments and benefits from payments made by Barbara.

51.     These payments to David and payments for his benefit were from the Holdback account or otherwise derived from funds owed to and/or promised to the plaintiffs, and were not payments made in exchange for fair consideration. Certain fraudulent conveyances of payments by Barbara for the benefit of defendant's medical office operations continue to this day.

52.     Defendant has obtained benefits which in equity and good conscience should be paid to the plaintiffs.

53.     Until recently, plaintiffs were not aware of defendant's past and continuing beneficial receipt of certain payments that were made to him or for his benefit without adequate consideration, nor were plaintiffs aware until long after the fact that there were hundreds of thousands of dollars of undocumented and unrepaid "loans" made to defendant of funds owed to plaintiffs, nor that transactions Barbara made with defendant, or instructed be made, were without adequate consideration being provided by defendant and at a time when she and Jobar were insolvent.

54.     Plaintiffs were unaware of many of the relevant and material facts regarding transactions and fraudulent conveyances that defendant had arranged with Barbara, or that defendant had repaid nothing, and that their scheme continued to the present, until David's January 19, 2023 deposition in the Buck v. Barbara Halio Case.

55.     Plaintiffs were unaware that Barbara had made, and continued to make, payments of funds and unpaid loans to defendant when she made them in 2020, and were unaware until this year that Barbara continued to make payments for defendant's benefit, that serve to diminish

19

Case 1:23-cv-11217-JGLC   Document 1-1   Filed 12/27/23   Page 21 of 44

her assets to this day; fraudulent conveyances paid by Barbara to support defendnat and the operations of his medical practice. Material facts, including defendant's failure to repay anything and his receipt of beneficial payments from Barbara through the present day, were first learned by plaintiffs at David's January 19, 2023 deposition, conducted in the Buck v. Barbara Halio Case.

56.     Without the knowledge, permission, and/or authorization of Buck, the above actions by defendant, acting in concert with Barbara, resulted in direct financial harm to Buck, to the equitable owner of 38% of the Holdback funds, and to the promisee of repayment by Barbara, who instead transferred to defendant, without adequate consideration, hundreds of thousands of dollars she owed to Buck, thus denuding herself of assets owed to plaintiffs.

57.     After transferring money from Jobar to Barbara and/or for the retention or improvement of appreciated assets under the control and direction of Barbara, she paid monies to defendant or used the funds directly for defendant's benefit, paying his personal expenses and to pay his creditor, among other uses.

58.     Defendant received misappropriated funds by participating in Barbara's scheme, funds held for the benefit of, and promised to be paid to, plaintiffs.  This occurred without the knowledge, permission, consent and/or authorization of plaintiffs, and, in most incidents without the proper corporate actions, authorizations and approvals. In so doing, defendant has been unjustly enriched.

59.     As a proximate result of defendant's actions in concert with and in support of Barbara's fraudulent activities as described herein, plaintiffs have sustained, and will continue to sustain damages, in an amount to be proven at trial, but in no event less than $1,500,000.

4886-3663-6818, v. 1

Case 1:23-cv-11217-JGLC Document 1-1 Filed 12/27/23 Page 22 of 44

## SECOND CAUSE OF ACTION

### (Aiding and Abetting Barbara's Breaches of Fiduciary Duties)

60. Buck repeats and re-alleges each and every allegation contained in paragraphs 1 through 59 with the same force and effect as though fully set forth at length herein.

61. Jobar Holding Corporation is a small family-owned corporation organized on March 27, 1958 to purchase the commercial property located at 120 West 72nd Street, New York, New York where the family bakery known as Cake Masters was going to operate.

62. Barbara become sole president of Jobar upon the death of her sister, Joan Buck, in 2005.

63. Barbara has also been a Director of Jobar since at least 2005.

64. By virtue of Barbara's acceptance of her respective offices in Jobar, she was a fiduciary towards Jobar's shareholders, including Buck, and owed them, a duty of faithfully, loyally, diligently, prudently, honestly and carefully conducting the business of Jobar and conserving Jobar's assets. As a fiduciary, Barbara was bound to deal with Jobar shareholders, the Buck plaintiffs, and with Jobar, with the utmost fidelity, loyalty, care and good faith.

65. After the 2006 sale of the Jobar Property, and the distributions made to the Jobar shareholders, Barbara's sole responsibility was maintaining and distributing the Holdback and closing the corporation. She failed to perform her responsibilities, instead fraudulently denuding the Holdback for her own personal benefit and for the benefit of her children. From 2008 to the present, Barbara has perpetrated a systematic scheme to defraud plaintiffs, failed to distribute 38% of Jobar assets and funds as legally required and promised to be paid to Robert Buck, and misappropriated and converted assets and funds of Jobar which she diverted for her own benefit,

and/or for the benefit of members of Halio's immediate family, most prominently defendant, continuing to the present.

66. Barbara accomplished these breaches of her fiduciary duties owed to plaintiffs with the cooperation and assistance of defendant, whom, aside from Barbara, was the primary beneficiary of Barbara's breaches of her fiduciary duties to the plaintiffs, including, but not limited to, her duties to maintain, safeguard and pay to plaintiffs the funds that were held or owed to plaintiffs.

67. Upon information and belief, continuing to the present, defendant has received, without adequate and fair consideration, as much as one million dollars of payments and benefits from Barbara's breaches of her duties owed to plaintiffs to maintain and repay funds owed to plaintiffs.

68. Defendant participated in, and he has directly benefited from, Barbara's multiple breaches of her fiduciary duties owed to plaintiffs as described herein. Defendant conspired with Barbara to disguise their transactions as fake "loans," or payments with fair consideration that did not exist and other deceptive practices. The "loans" defendant received from Jobar were never intended to be repaid, no interest or maturity dates were provided for, and defendant admits that neither interest nor principal on the "loans" were ever paid by him.

69. Upon information and belief, after Barbara transferred money from the Jobar account to herself, and/or to those under her control and direction, including defendant, defendant received, kept and failed to repay the looted funds, or any other fraudulent conveyances, using them for his personal expenses and to pay his creditors, among other things. At his January 19, 2023 deposition, defendant blithely acknowledged he received, kept and failed to repay the "loans" and other payment, claiming he never asked Barbara to send them.

70.     As a proximate result of defendant's actions in aiding and abetting Barbara's breaches of her fiduciary duties to plaintiffs, plaintiffs have sustained, and will continue to sustain, substantial damages, in an amount to be proven at trial, but in no event less than $1,500,000, together with legal fees of no less than $500,000, plus costs and interest.

### THIRD CAUSE OF ACTION

### (Civil RICO)

71.     Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 70 above with the same force and effect as though fully set forth at length herein.

72.     Barbara and David, acting pursuant to agreements and understandings in transactions over a period of  more than a decade, with certain activities continuing to the present, including, but not limited to repeated fraudulent transactions in which Barbara transferred funds using the mails and wire, for the purpose of hiding her and David's incomes from income tax liability, and as late as 2020 to divest and hide her assets, including, without limitation, transferring assets owed to plaintiffs to her children's possession, such as is described in paragraph 3 above,  so as to denude herself of assets reachable by plaintiffs.

73.     The transactions complained of hereinabove, each caused losses to plaintiffs, all in amounts of significantly more than $5,000 each over several different one-year periods in the past two decades and through the present day.  David and Barbara engaged in substantially more than two acts in the past ten years constituting a pattern of racketeering with acts of mail fraud, wire fraud, tax fraud, and other tortious acts.  Barbara engaged in thefts by deception and thefts by conversion, and David assisted her, receiving and keeping misappropriated funds and concealing the transactions and their true nature, such as is described in paragraph 3 above.  With David's assistance, Barbara continued her fraud and other predicate acts to the present with

regard to the looting, transferring and hiding of assets to the detriment of creditors, as further detailed above and below. The acts of Barbara and David include, but are not limited to, the following predicate acts of racketeering as defined in 18 U.S.C. §1962 (c), in New York Penal Code Article 460, et seq., in 18 U.S.C. §§1343 and 1951, and in other relevant statutory provisions. Barbara, acting in concert with David and others, utilized their positions to commit or assist in committing tortious acts, and breached, or assisted in the breaching of, fiduciary responsibilities to Jobar, to Jobar shareholders and Buck, through their associating together as the enterprise through and including to the present day, through the use of materially and intentionally false statements sent through the U.S. mail and electronic transmissions sent in interstate transmissions, including in and to the States of New York, California and in and to Washington, D.C.

        (a)    Mail fraud:

        (i)    Barbara and David violated 18 U.S.C. §1341, the mail fraud statute, through their scheme to defraud Jobar, the Estate of Joan Buck and Robert Buck using false and fraudulent statements they have made, directed or assisted in supporting, in tax, estate and corporate reports and filings purportedly for, on behalf of and in furtherance of Barbara's fiduciary duties to Jobar, the Estate of Joan Buck, Robert Buck and to the Estate of Kitty Buck. These include fraudulent Jobar bank transactions and corporate and tax reports and filings and insurance reports and filings as further specifically alleged hereinabove and below, within the last ten years and in a pattern extending over nearly two decades. As to Jobar, this pattern commenced on or about 2008, continuing to the present day, through communications placed in authorized depositories for mail to be sent or delivered. These mailings include, but are not limited to, tax reports and other documents furthering their scheme that were sent through the

mails by, or on behalf of, Barbara and David in each year on and after 2008 through at least February 2017 as to Jobar, and to the present as to their personal filings, including, but not limited to, those described above and elsewhere herein.

    (b)    Wire fraud:

    (i)    Barbara, with David's aid and assistance, acted in violation of 18 U.S.C. §1343, the wire fraud statute, in furtherance of their scheme to utilize Jobar by means of false pretenses which were contained in bank, corporate and tax documents repeatedly transmitted by means of wire in interstate commerce which David and Barbara knew contained false and fraudulent statements for the purpose of executing their scheme of using Jobar's continued corporate existence after 2008 for their fraud, to the detriment of plaintiffs.  These include, but are not limited to transmissions by, between, for or from Barbara and David of Jobar tax returns and tax filings and K-1's in the years 2008 through at least February 2017, e-mails with attachments sent for and to Buck, to the Internal Revenue Service and local taxing authorities in 2008 up to and including the present, and wired payments to David, all in furtherance of their fraud and other wrongs alleged herein, including depriving the entitlements of the Estate of Joan Buck and Robert Buck to 38% of Jobar assets distributed to or for the benefit of Jobar shareholders, but which were not distributed to the Estate of Joan Buck and Robert Buck, all in connection with the fraudulent "loan" scheme and fraudulent transfers set forth above, including in paragraph 3 above, and below.

    (c)    Bank fraud:

    (i)    Barbara continued to control and engage in transactions in the bank account assets of Jobar through at least 2017.  Barbara, with David's assistance, made false statements to the JP Morgan Chase Bank Jobar account custodians, to Jobar shareholders, and to

Case 1:23-cv-11217-JGLC   Document 1-1   Filed 12/27/23   Page 27 of 44

taxing authorities, and through omissions, in failing to state to them the true facts, all for the purpose of advancing the "loan" scheme and other fraudulent conveyances, such as described in paragraph 3 above, and to hide assets from plaintiffs. In the instances of the numerous unexplainable "loan" transactions between Barbara and Jobar, and between David and Jobar, as well as more recent transactions described herein, Barbara, as an officer and director of Jobar, acting with the knowing aid and assistance of David, engaged in numerous fraudulent banking transactions, including in the accounts and acts described herein, all to the detriment of plaintiffs, in "loans" denuding Jobar of all of its "holdback" funds, and in transactions designed to denude Barbara of assets. 30% of those holdback Jobar funds, Barbara acknowledges, were the property of the Estate of Joan Buck and 8% the property of Robert Buck. Barbara's material omissions included her failure to disclose that she lacked the proper permission and authorization required for removal of the "Holdback" funds. The "loan" transactions were never approved of by plaintiffs. They were fraudulently effected by Barbara not first informing Buck of the proposed "loans" she effected from Jobar to herself, and by Barbara and David not preparing, distributing or informing the bank, and Buck, of the facts of the "loans" or of any terms of the "loans," for example, purpose, interest rate, duration and repayment. The funds were taken by Barbara and by David with none of these essential terms that would be required of anyone taking a loan, let alone a fiduciary responsible for the holding, management and proper distribution of the Holdback.

(ii) In much of this, David was a beneficiary without whose aid and cooperation Barbara's scheme would not have been accomplished. David has been both an enabler and a facilitator, including, but not limited to permitting, facilitating, receiving, keeping and not repaying fraudulent conveyances he received as a result of Barbara's fraud, and filing

Case 1:23-cv-11217-JGLC   Document 1-1   Filed 12/27/23   Page 28 of 44

false reports with taxing authorities regarding the purloined funds and unreported income. These acts by David supported and allowed for Barbara to hide and continue her "loan" scheme, the plundering of the Holdback funds, and fraudulent conveyances continuing to the present. The scheme included destroying plaintiffs' rights and interest in the Holdback, diverting Barbara's assets so that they would not be available to plaintiffs to recover their losses at her hands, and hiding payments and assets. These were the purposes behind Barbara's and David's liquidation of the Jobar bank accounts and the fraudulent conveyances described herein, in which David assisted and from which he directly benefited. That is why they acted illegally, without informing the banks, Jobar or Buck, all in violation of 18 U. S. Code §1344, and with the knowing assistance, cooperation and participation of David.

## THE ENTERPRISE

74.    Barbara, acting in concert with David and others, joined in association to use Jobar and the Estate of Kitty Buck as an enterprise which they both used to obtain funds from Jobar, to aid Halio in her fraudulent acts, and to cause plaintiffs losses through the present and Buck's loss of assets of the Kitty Buck Estate, diverted and hidden to this day. Barbara sought to obtain and did obtain by deceit, by threat, fear and under color of official right, certain material benefits to which she was not legally entitled, all in furtherance of a plan to benefit herself, with the aid of David and others, to obtain, transfer and hide or destroy the value or availability of assets to which plaintiffs were entitled, or for which certain plaintiffs had an expectancy as beneficiaries of the fiduciary positions Barbara held as an officer and director of Jobar, and as Executor of the Estate of Kitty Buck.

75.    Jobar is a privately held shell company, that operated a bakery business in Manhattan until 1990, and closed the operating business entirely when it sold the Property in

2006, several years after the 2001 death of its founder and CEO, Kitty Buck, the mother of Defendant Barbara Halio and of Joan Buck, and the grandmother of Robert Buck. Halio and Joan Buck were named co-Executors of the Estate of Kitty Buck and were each the equal beneficiaries of the substantial majority of the Estate of Kitty Buck, including 50/50% ownership and control of Jobar. Joan Buck died in 2005, and Robert Buck is the Executor of her estate. From the 1990's to 2005, Jobar continued to own and rent out the building in which the bakery had been located, 120 West 72nd Street in Manhattan. In 2006, Jobar sold the building for $22 million dollars, and, by 2008, all but $1.5 million of the net proceeds of that sale had been distributed to the Jobar shareholders, proportionate to their percentage of ownership interests in Jobar.

76. The Estate of Kitty Buck, filed in New York County Surrogate's Court on her death in 2001 at the age of 93, included Jobar stock, two apartments and Florida real estate lots, IBM stock, jewelry, art, furnishings and other personal items. Joan Buck and Barbara were named co-Executrices. However, because Joan fell deathly ill, Barbara soon took over the managing of the Kitty Buck Estate, and Barbara appropriated to her dominance and control portions of the Kitty Buck Estate properties and personal effects to which she was not entitled, including, without limitation, assets of Jobar, and which she has secreted, transferred and maintained away from the rights of the Buck plaintiffs.

77. Robert Buck has made requests of Barbara to be informed of the whereabouts of the Jobar Holdback funds, undistributed properties and assets of the Kitty Buck Estate, and to this day Barbara has stalled, avoided, stonewalled and refused to pay Robert as she promised, and refused to account for and deliver Jobar assets and assets of the Kitty Buck Estate which were to be shared as provided for in the Kitty Buck will.

78.     After the Holdback of $1,500,000 was created in 2006, Barbara used the opportunity and control provided by her fiduciary position as Executor, as an officer and director of Jobar, as signatory on the Jobar bank accounts, and through her relationship with David, to treat the assets and funds entrusted to her as her own, instead of distributing them to the Estate of Joan Buck as to 30% of the Holdback, and Robert Buck as to 8% based upon their ownership of those percentages of Jobar equity, and the 50% share Joan owned in the Estate of Kitty Buck. Instead, Barbara took most of the Holdback as "loans" to herself, and transferred most of the balance to, or for the benefit of, David, including in transactions specifically described in paragraph 3 above. Acting in concert as to the fraudulent "loans," Barbara and David have each failed and refused to return to the Jobar account any of the purloined funds, including funds taken through other fraudulent conveyances.    Barbara and David, to this day, continue to knowingly falsely report Barbara's $1,140,975 of fake "loans," David's fake "loans" and other transfers he received from Barbara and from Jobar to the taxing authorities, all in continued knowing support of the false and fraudulent nature of the "loans" and the other transactions described herein.    None of the "loans" were reflected in promissory notes, no interest was provided for nor was any interest or principal repaid for these unsecured personal "loans" and no documented maturity date shown anywhere for repayment to Jobar.  Barbara transferred money out of the Jobar Holdback bank account, and subsequently, out of her own account, with the cooperation of David, and with his knowledge that hundreds of thousands of dollars of transfers he received or that were made for his benefit as described in paragraph 3 above and referenced elsewhere herein, were improper, being disproportionate dispersals to shareholders and fraudulent conveyances to David, including to the present.  David has failed and refused to

provide any explanation and failed and refused to return the fraudulent conveyances or to repay the "loans."

79.     The "loans" are the acts of a faithless servant, and the fraudulent conveyances are acts to defraud creditors, all in breach of Barbara's fiduciary duties, and David's obligation not to receive and keep the benefits of the fraudulent conveyances he knew to be improper.  They constitute a pattern of mail fraud, wire fraud and tax fraud.  Barbara and David have effectively engaged here in a pattern of theft by deception: obtaining the Jobar Holdback funds and the fraudulently conveyed funds by deceitful means or artful practice, with the intention and the effect of depriving plaintiffs of their property, the Holdback funds, and other assets described hereinabove and below.

80.     In furtherance of this scheme and pattern of racketeering, Barbara and David utilized the mails and wires in interstate commerce, and by omissions and failure to inform and obtain knowing consent to the numerous wrongful appropriations of funds and property effected by them, they have retained dominion and control over the purloined funds and the withheld and the fraudulently conveyed or hidden assets.

81.     Barbara and David, acting in concert for years, in part by sending and receiving purloined funds, and by filing and sending through the mails false and misleading tax returns and K-1 Forms filed on their instructions and approvals. K-1 Forms are annual reports filed with the IRS by entities, including Sub-Chapter S corporations such as Jobar.  The K-1's serve as official reports to the IRS and to shareholders, such as Buck, as to the individual shareholder's "Share of Current Year Income, Deductions, Credits, and Other Items."   K-1's are sent to shareholders with the intention that they rely on them to accurately prepare and report on their own taxable income and deductions to the IRS.  Barbara and David have admitted in sworn statements that

Case 1:23-cv-11217-JGLC Document 1-1 Filed 12/27/23 Page 32 of 44

they have acted improperly with regard to Barbara's fiduciary duties as President and Director of Jobar, and Executor of the Estate of Kitty Buck, having been entrusted with the care and safe keeping of assets including, but not limited to, $1,500,000 of Jobar Holdback funds for the benefit of the Jobar shareholders. Those funds are gone to the coffers of Barbara and David, and their creditors, spent for their own benefit and purposes, causing losses to the plaintiffs. Barbara, with David's connivance and, as to himself, active participation, acted improperly in furthering the scheme by supervising and reporting materially false information, under-reporting their incomes to the IRS and local taxing authorities on official annual income and tax report documents which were filed by transmitting them in interstate commerce in the mails and over the wire to the present.

82.     The Estate of Joan Buck, owner of 30% equity in Jobar and Robert Buck, owner of 8% of Jobar equity, were entitled to notice of, and to approve of, Barbara and David taking "loans" and other transfers out of their 38% of the $1,500,000 Holdback funds, and other transactions, such as Barbara's fraudulent transactions with David, continuing to the present, contributing to losses of plaintiffs and their inability to collect funds owed to them. By the use of deceitful means or artful practice, with the aid of David, Barbara and David took and maintained wrongful possession and wrongfully retained plaintiffs' funds that had been entrusted to her management as an officer, director and bank signatory of Jobar for those funds, and as the recipient of further funds Barbara promised to repay, but instead secretly transferred away, including to David. Barbara and David disguised and hid from plaintiffs the wrongful taking as "loans" by not informing Buck that they were not truly loans, as evidenced by not taking steps to evidence them as loans, such as through promissory notes with provisions for interest and terms

for repayment, let alone satisfying the requirement for corporate documents approving such "loans."

83. David and Barbara, through the preparation, filing, mailing and electronic communications containing materially false, fraudulent and misleading statements and information, avoided personal income tax on more than $1,500,000 of undeclared personal income, continuing to the present. They did this by, among other things, falsely declaring each year, to the present, that the funds looted from Jobar were "loans," as well as other loans and gifts falsely labeled as such in transactions with others. These also include "loan" and other fraudulent conveyances by Barbara to David, such as gifts and other transactions, including, but not limited to a fraudulent conveyance "loan" in 2020, and fraudulent conveyance transactions with David, continuing through at least 2020 and thereafter, all to the detriment of and losses by plaintiffs.

84. Shortly after having received Amended 2014 K-1's from the personal accountants for Barbara and for David, who were also the accountants for Jobar, in a March 11, 2017 telephone conversation between Robert Buck and Mark A. Bernstein ("Bernstein"), the Turman & Eimer, LLP partner in charge of the tax preparation personal accounts of both David and Barbara, and also of Jobar, Bernstein admitted that, for some years, Barbara had acted improperly when she disproportionately distributed holdback funds, primarily to herself, but also to or for her son, David and others. In that call, Bernstein did not claim that Barbara's actions were proper; he acknowledged they were not. Bernstein told Robert that Jobar K-1's he had prepared regarding the Estate of Joan Buck and Robert Buck, particularly for the 2014 tax year, and that were distributed for 2014, were incorrectly prepared and were "mistakes." Bernstein explained that the numbers attributed to the Estate of Joan Buck on the 2014 K-1 ($390, 000) and

on the Robert Buck 2014 K-1 ($104,000) represented moneys that Barbara Halio had misappropriated to herself from the Jobar Holdback. Bernstein admitted that it was a mistake; that it was wrong and needed amending. David aided the scheme by knowingly participating in and benefiting from the scheme through his own receipt of falsely reported "loans" and his own false and misleading tax filings, continuing to the present, sent through, and facilitated through the use of, the mails and electronic communications, and filed with the Internal Revenue Service and local taxing authorities in and before 2015, and continuing to the present.

**Predicate RICO Acts**

85.     In and for each of the tax years throughout the time period from at least January 2008 to the present, the defendant, acting in concert with his mother, Barbara, supported, caused to be created, filed and submitted materially false and/or fraudulent tax returns and Form K-1's, including to the plaintiffs, to the Internal Revenue Service of the United States and to local taxing authorities through the use of and/or knowledge of the use of United States mails and wires, and each of David and Barbara supported, aided and abetted the other in fraudulent conveyances such as those described in paragraph 3 above, and in creating, filing and submitting such falsified materials to the income taxing authorities.  These acts constitute a number of related predicate acts committed by David and Barbara over a substantial period of time.

Specific predicate RICO acts alleged herein include the following:

(i)     The use of false statements and omissions in connection with reporting David's "loans" and Barbara's "loans" from Jobar, which they transmitted electronically and by mail, falsely reported in the K-1's Jobar issued each year from at least 2008 through 2017, and in their personal income tax filings to this date.  Their plan was for David and Barbara to avoid paying income tax on the distributions by calling them "loans."

33

(ii)     The use of the mails and wire in interstate commerce, in false filings made and

sent to the Jobar shareholders each year from 2008 and thereafter to the present, wherein David

supported Barbara's failure to properly report his "loans" and her "loans." For example:

(a)     The 2014 K-1, and tax reports sent to the Estate of Joan Buck using the

mails and wire in interstate commerce filings for Jobar with the Internal Revenue Service,

directed by Barbara, prepared by Bernstein, falsely portrayed the "loans" Barbara took from

Jobar as "Items affecting the [Estate of Joan Buck's] shareholder basis" in the materially untrue

amount of $390,021, when the true amount was zero, and the true information was withheld from

taxing authorities by Barbara, with David's aid and active participation and support through the

present.

(b)     The 2014 K-1 sent to Robert Buck using the mails and wire in interstate

commerce filings for Jobar with the Internal Revenue Service, directed by Barbara and prepared

by Bernstein, falsely portrayed the "loans" that David and Barbara took from Jobar as "Items

affecting [Robert Buck's] shareholder basis" in the materially untrue amount of $104,006 when

the true amount was zero, and the true information was withheld from Robert Buck by Barbara,

aided and abetted by David's active participation and support using false reports sent through the

mails and electronically in interstate commerce through the present.

(c)     The Jobar annual tax returns that Barbara directed be prepared and

disseminated by Bernstein each year after 2007 through 2017, sent to Jobar shareholders each

year, including the Estate of Joan Buck and Robert Buck, using the mails and wire in interstate

commerce, filed with the Internal Revenue Service, falsely reported the "loans" to David

described in paragraph 3 above, among other falsely reported transactions, and falsely reporting

the Jobar "loans" to Barbara as assets of Jobar for years after 2008 through 2017, even after

34

Case 1:23-cv-11217-JGLC Document 1-1 Filed 12/27/23 Page 36 of 44

when Barbara had claimed she could not repay the loans; and David has failed and refused to repay them. This was and is a material part of the scheme to help David and Barbara avoid paying personal income taxes they owed to the government by false personal income tax filings transmitted to the IRS and local taxing authorities through interstate wire transmission in the years between 2008 to the present, after they had purloined the funds from the Holdback and sources derived therefrom.

(d)     There was a continuing course of conduct of violative and disproportionate distributions made by Barbara to David and to herself out of the $1,500,000 plus interest in the Jobar Holdback that Barbara and David had steadily removed, 38% of which was held in trust for the Estate of Joan Buck and for Robert Buck.  This was year after year theft, hidden from the plaintiffs by disguising them as "loans," such as those specifically described in paragraph 3, above, when there was no such agreement between David and Jobar or between Barbara and Jobar shown in any writings indicating interest terms, purpose of loans, repayment terms, and other considerations normally present when one party loans money to another, particularly in a corporate setting, with a number of independent shareholders.

86.     As a proximate result of David's actions made in concert with Barbara's actions, plaintiffs have sustained, and will continue to sustain damages, in a total amount to be proven at trial, but in no event less than $2,500,000, and $600,000 in legal fees.

## **FOURTH CAUSE OF ACTION**

### (Civil RICO Conspiracy Against David)

87.     Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 86 above with the same force and effect as though fully set forth at length herein.

Case 1:23-cv-11217-JGLC    Document 1-1    Filed 12/27/23    Page 37 of 44

88.   18 U.S.C. §1962(d) allows for a claim based upon the ongoing conspiracy between David and Barbara, as more fully set forth above and below.  David and Barbara continue to maintain their fraudulent claims regarding the removal of $1,500,000 plus interest from the Jobar Holdback, and continue to divert and hide assets to which the Estate of Joan Buck has equitable title, and assets that are owed to and were promised to Buck, including through deceptive and fraudulent transfers of funds and properties alleged in paragraphs 3, 16, 28, 34, 37, 42, 73, 83, 84 and 92.  Thus, David, acting in concert with Barbara, has caused, and they are causing, injury to and loss of plaintiffs' properties as alleged herein, in their ongoing support of Barbara's dominion over wrongfully obtained and improperly transferred and held funds, while stating false and fraudulent reasons for their actions, all in aid and support of Barbara's admitted breaches of her fiduciary duties as officer and director of Jobar and as Executor of the Estate of Kitty Buck.  The false and fraudulent statements and acts of David and Barbara, aided by Bernstein, furthered the enterprise arrangement that Barbara and David made and have effected through this lengthy pattern of associated activity, continuing to the present, for their personal benefits and causing losses to the plaintiffs, including the utilization of Barbara's position as Executor of the Estate of Kitty Buck to effect, continue and exacerbate the Buck losses.

89.   David and Barbara, as set forth above, all with regard to their fraudulent acts in connection with the looting of assets and fraudulent processing of Jobar transactions, and in the Estate of Kitty Buck, caused losses as to assets owed to be held for and paid to Buck, continuing to the present.  These include assets that devolved upon, or should have devolved upon, the Estate of Joan Buck, and the diversion and withholding of assets held for and owed to Robert Buck, and the rights, funds and property asserted hereinabove, including but not limited to the Holdback funds, tax overpayments, property and other rights.  David's assistance to and benefit

from Barbara's thefts, removal and withholding of Kitty Buck Estate assets and those owed to Robert, constitute a pattern of racketeering, in material portions of which David participated and benefited personally. This pattern of behavior and transactions, included activities involving and affecting interstate and banking commerce caused losses to the plaintiffs.

90. As a proximate result of these actions that David committed in concert with Barbara, plaintiffs have sustained, and will continue to sustain damages, in an amount to be proven at trial, but in no event less than $2,500,000, and at least $600,000 in legal expenses and costs in protecting plaintiffs' interests, the Kitty Buck Estate and in recovery of the fraudulent conveyances.

## FIFTH CAUSE OF ACTION

### (Fraud)

91. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 90 above with the same force and effect as though fully set forth at length herein.

92. David and Barbara have obtained benefits and funds, causing Jobar losses and causing Buck losses of 38% of the $1,500,000 plus interest Holdback amount, and Buck the loss of assets of the Estate of Kitty Buck, by their fraudulent acts and fraudulent statements in filed tax reports and other documents as alleged in paragraphs 3, 16, 28, 34, 37, 42, 73 and 84, and as set forth in this paragraph 92 below. Their fraudulent acts and materially false statements include:

(i) The use of false statements and omissions in connection with David's "loans" and Barbara's loans from Jobar, including those set forth in paragraph 3 above, which Barbara caused to be prepared and transmitted electronically and by mail, falsely reported in the K-1's and in Jobar's and her tax returns issued through at least 2017 in and for at least the years

2008 through 2015, and that David and Barbara caused to be issued and falsely reported in their own personal tax returns to the present. Their scheme is that, in preparing and filing false tax documents, Barbara and David avoid paying income tax on the distributions by calling them "loans" or gifts, or just failing to identify and report the transactions and transfers of funds at all, to this day.

(ii)     Using the mails and wire in interstate commerce, to transmit Jobar tax report documents filed with the Internal Revenue Service and related documents that Barbara directed be sent by Turman & Eimer LLP to the Jobar shareholders each year, including in and after 2008 through 2015, in which the "loans" to Barbara and David by Jobar were reported falsely and in a materially misleading manner. For example:

(a)     The 2014 K-1 sent to the Estate of Joan Buck using the mails and by wire in interstate commerce filings directed by Barbara to be filed with the Internal Revenue Service, falsely portrayed the "loans" Barbara took from Jobar as " Items affecting the [Estate of Joan Buck's] shareholder basis" in the materially untrue amount of $390,021 when the true amount was zero, and the true information was withheld by Barbara until 2017 and thereafter.

(b)     The 2014 K-1 sent to Robert Buck using the mails and by wire in interstate commerce filings directed by Barbara to be filed with the Internal Revenue Service, falsely portrayed the "loans" Barbara took from Jobar as " Items affecting [Robert Buck's] shareholder basis" in the materially untrue amount of $104,006 when the true amount was zero, and true information as to Jobar "loans" was not told to Robert Buck until after 2017.

(c)     The Jobar annual tax returns that Barbara directed be prepared and disseminated each year after 2006 through 2017, using the mails and wire in interstate commerce, filed with the Internal Revenue Service and sent to Jobar shareholders each year,

including the Estate of Joan Buck and Robert Buck, falsely reported the "loans" to Barbara as assets, even after when Barbara had claimed she could not repay the loans; and the returns did not at all report the outstanding and unrepaid "loans" and transfers to David for his benefit, including those set forth in paragraph 3 above. These fraudulent acts were done by Barbara, with David's cooperation and assistance as to his own "loans," to assist David and Barbara in misreporting their incomes on their tax returns so as to avoid paying personal income taxes they owed to the government through false personal income tax filings transmitted to the IRS through interstate wire transmission in the years between 2008 to the present, after they purloined the funds from Jobar that they continue to withhold from plaintiffs to this day.

        (d)     The violative disproportionate distributions to Barbara and David by Jobar out of the $1,500,000 Jobar Holdback and other funds derived therefrom, that Barbara and David had steadily purloined from the Holdback, and in subsequent transactions, 38% of which were held in trust for the Estate of Joan Buck and for Robert Buck. These were accomplished, in part, in year after year purloining of funds, hidden from the plaintiffs by disguising them as "loans" when there was no loan agreement between David and Jobar or between Barbara and Jobar shown in any writings indicating interest terms, purpose of loans, repayment terms, and other considerations normally present when one party loans money to another, particularly in a corporate setting, with a number of independent shareholders, regardless of whether or not they are related to one another.

        93.    The reliance by Buck on the Jobar documents and tax filings, reports and documents that Barbara caused to be provided to Buck was reasonable and justifiable under the circumstances. Barbara intended that Buck rely thereon, and David was aware that the shareholders, including Buck, were reliant upon the information reporting Jobar operations each

year that they received at Barbara's direction. David was aware that the information regarding his "loans," and information withheld from Buck as to David's "loans" were similarly relied upon by Buck. David knew the statements and omissions and misrepresentations regarding his "loans" from Jobar contained in or omitted from the documents, were false. Buck reasonably relied on Barbara's statements and misrepresentations, which were supported by David's actions in support of his own "loans" to Buck's detriment, and Robert Buck and the Estate of Joan Buck have lost the entirety of their 38% ownership interest in the Jobar Holdback funds, and other assets, as a direct result of the fraudulent acts of Barbara, aided and abetted by David as described herein.

94.    As a proximate result of Barbara's actions, aided and abetted by David as set forth hereinabove, Buck has sustained, and will continue to sustain damages, in an amount to be proven at trial, but in no event less than $2,000,000, together with legal fees in the amount of no less than $600,000, plus costs and interest.

## SIXTH CAUSE OF ACTION

### (Aiding and Abetting Fraud)

95.    Plaintiffs repeat and re-allege each and every allegation contained in all of the preceding paragraphs with the same force and effect as though fully set forth at length herein.

96.    Barbara was employed by Jobar as its President from 2005 through the present, or such other time as it became inactive. After 2006, the material services she was required to perform as her duties were limited to maintaining the integrity and safety of the Holdback of $1,500,000 of funds and interest thereon held and earmarked to be distributed to the Jobar shareholders proportionate to their ownership interests in Jobar's shares, and not to be disproportionately distributed. Barbara was also required as a material part of her duties, to

supervise the records of the corporation, to carefully and accurately report transactions to shareholders and to taxing authorities, and to have accurate and truthful tax filings and reports made of the corporate results each year.

97.     In the performance of these duties, Barbara literally stole funds from the Jobar Holdback, with the assistance and support of David as to funds she sent to him. Barbara has admitted that she took at least $1,140,000 of the Jobar Holdback funds in so-called "loans" that she never repaid. David admits that hundreds of thousands of dollars were sent to him out of the Holdback as "loans" which he has not repaid. David also received and benefitted from transfers of funds made by Barbara from the Holdback and assets supported by Holdback transfers which David admits he received, but now claims he never requested.

98.     To hide improper transactions, Barbara caused the preparation and filing of false tax returns and the issuance of false K-1's, as described above. David, too, acting in concert with, and to facilitate her acts, also caused the preparation and filing of false personal income tax returns to the present day, all in support of their fraudulent scheme to loot Jobar, and to take improper control and possession of assets to which they had no legal right, all to the detriment of plaintiffs' rights to the assets, and causing direct losses to plaintiffs.

99.     Accordingly, David is liable to plaintiffs for his actions in aiding and abetting the fraud perpetrated by Barbara on the plaintiffs as set forth above, and for his own fraudulent actions as to the "loans" and other transactions in support of Barbara's tortious and fraudulent actions in her dealings with the assets that were and are owed to plaintiffs by them.

100.   As a result, David is liable to plaintiffs for funds looted from Jobar, and the amounts owed to Buck and assets wrongfully withheld from Robert Buck and from the Estate of

Joan Buck, in the amount of $2,000,000, together with plaintiffs' legal fees in an amount no less than $600,000, plus costs and interest thereon.

**WHEREFORE,** plaintiffs request a judgment:

1.      Granting the relief requested in the Complaint in the amount of $1,500,000 dollars in compensatory damages on the First Cause of Action, together with plaintiffs' legal fees, costs and interest.

2.      Granting the relief requested in the Second Cause of Action of the Complaint in the amount of $1,500,000 in compensatory damages, together with legal fees of no less than $500,000, plus costs and interest.

3.      Granting the relief requested in the Third Cause of Action of the Complaint in the amount of $2,500,000 in compensatory damages, together with legal fees of no less than $600,000, plus costs and interest.

4.      Granting the relief requested in the Fourth Cause of Action of the Complaint in the amount of $2,500,000 in compensatory damages, together with legal fees of no less than $600,000, plus costs and interest.

5.      Granting the relief requested in the Fifth Cause of Action of the Complaint in the amounts of $2,000,000 in compensatory damages, together with legal fees of no less than $600,000, plus costs and interest.

6.      Granting the relief requested in the Sixth Cause of Action of the Complaint in the amount of $2,000,000 in compensatory damages, together with legal fees of no less than $600,000, plus costs and interest.

4886-3663-6818, v. 1

Case 1:23-cv-11217-JGLC   Document 1-1   Filed 12/27/23   Page 44 of 44

7.      Granting plaintiffs treble damages on the relief requested against defendant David Halio, on the Third, Fourth, Fifth and Sixth Causes of Action in the Complaint.

Dated:     New York, New York
           November 20, 2023

                        Respectfully submitted,
                        **SCARINCI & HOLLENBECK, LLC**

                        By:    /s/ Dan Brecher
                              DAN BRECHER, Esq.
                        589 Eight Avenue, 16th Floor
                        New York, New York 10018
                        Telephone: (212) 286-0747
                        E-mail: dbrecher@sh-law.com
                        *Attorneys for Plaintiffs*

43